(19 Misc. Rep. 571.)

## In re OPENING OF BECK ST.

## In re OPENING OF FOX ST.

(Supreme Court, Special Term, New York County. February, 1897.)

1. HIGHWAYS—DEDICATION.

　　The owner of land, after filing a map thereof in 1851, showing certain streets, conveyed various lots as laid down on the map with reference to the streets. The conveyances included all the grantor's interest to the middle of the streets on which the several lots abutted, "subject, nevertheless, to the use thereof by the public heretofore granted and dedicated" by the grantor. The streets were never actually laid out, and there was no evidence of any grant to the public other than the filing of the map. Afterwards several conveyances were made of the lots, each containing the clause quoted, until 1873, when all the lots were conveyed to one M. without such clause. *Held*, that the rights of the public in such streets were extinguished at the time of the conveyance to M.

2. LIMITATION OF ACTIONS—MUNICIPAL CORPORATIONS.

　　The statute of limitation runs against a municipal corporation the same as against an individual.

Proceedings to open Beck street and Fox street, in the city of New York. The city moves to confirm the final reports of the commissioners. Denied.

Francis M. Scott, Corp. Counsel (Henry De Forest Baldwin, John P. Dunn, and Thomas A. Blake, of counsel), for the motion.

McCarty & Baldwin (Barclay E. V. McCarty and Jared G. Baldwin, Jr., of counsel), opposed.

STOVER, J. These are proceedings on the part of the mayor, aldermen, and commonalty of the city of New York, under the consolidation act, to open Fox and Beck streets, in the city of New York, and to acquire title to the property to be taken. The commissioners made their preliminary report in both proceedings, and on December 19, 1896, made their final reports. The motion is now made by the corporation counsel to confirm the final reports. By the preliminary report, the commissioners made an award of $7,200 to the owners for the value of land taken in each proceeding, making the total sum $14,400. In the final reports, the commissioners in each proceeding award only the sum of $4,200, making the total sum $8,400; the commissioners having determined, in making their last award, to deduct from the value of the land the value of certain alleged outstanding private rights of way over the property, and the rights of the public in the highway. The estate of John McConville is the owner of the

property through which these streets are laid, and the question to be determined upon this motion is whether there were outstanding rights of way, either in the public or private persons. There seems to be no material dispute as to the facts in the case, and, if the commissioners have proceeded upon a correct basis in estimating the value of the property taken, the court, of course, will not interfere, even though the amount might be less than the court would have determined if it had originally passed upon the question. The commissioners having determined upon the evidence what the value of the land taken is, the court will not review it, unless they have proceeded upon an erroneous basis.

In 1851, Gouverneur Morris owned a large tract of land, and filed a map of the same in the register's office of White Plains, called a map of East Morrisania, and surveyed by Andrew Findlay. Different streets were shown on this map, among which were Pontiac and Uncas streets, corresponding with the present Beck and Fox streets respectively, and Tinton and Prospect avenues, corresponding with the present Wales and Union avenues respectively. On March 4, 1853, lots Nos. 237 and 238, on the corner of Uncas (Fox) street and Tinton (Wales) avenue, were conveyed by Morris to one Garner. On April 8, 1853, lot No. 239, fronting on Uncas (Fox) street, was conveyed to Garner by Morris. In March, 1855, lot No. 240, fronting on Uncas (Fox) street, was conveyed by Morris to Robinson. These conveyances were by lot numbers with reference to said map, and by a description which bounded them "southerly by Uncas street." These lots abut on the northerly side of Uncas (Fox) street, and extend from the stone wall, the boundary line of the McConville property, to Tinton (Wales) avenue, comprising the entire one-half of the block between Prospect (Union) and Tinton (Wales) avenues. On November 1, 1855, Morris conveyed to Benjamin Whitlock the entire property claimed by the McConville estate, by lot numbers as shown on the map of East Morrisania, being Nos. 193 to 213, inclusive; 224 to 229, inclusive; 241 to 246, inclusive; 256 to 258, inclusive; and also 2 to 14, inclusive,—by a description bounding said lots by the sides of Pontiac (Beck) and Uncas (Fox) streets respectively, "together with all the right, title, and interest of the said party of the first part, his heirs and assigns, of, in, and to one-half of so much of the land contained in the streets and avenues laid out on said map, lying over, against, and opposite to the premises hereby conveyed, subject, nevertheless, to the use thereof by the public heretofore granted and dedicated by said Morris." In 1858, Gouverneur Morris filed another map, called the map of Wilton, Port Morris, and East Morrisania, which map, so far as the questions here are concerned, is in all respects similar to the map of 1851. In 1858 the lot No. 240 was conveyed by Robinson to Garner, and in June Garner conveyed four lots to Benjamin Whitlock, by deed recorded August 7, 1858. On March 31, 1858, Morris conveyed to Benjamin Whitlock all the remaining lots between Tinton (Wales) and Prospect (Union) avenues, fronting on Pontiac (Beck) and Uncas (Fox) streets, not conveyed by the deeds heretofore mentioned. So that by these conveyances the entire property became vested in Whitlock, who, on June

20, 1857, executed a mortgage to the Mutual Life Insurance Company. In 1866, the referee, in an action to foreclose said mortgage, conveyed to the Mutual Life Insurance Company the entire property. On January 12, 1867, the Mutual Life Insurance Company conveyed to Cornelius F. Timpson. On April 29, 1868, Cornelius F. Timpson conveyed to Henry F. Taintor, and on May 5, 1868, Taintor conveyed to Ann Eliza Timpson. The deeds up to this deed contain a grant of the lands contained in the streets and avenues laid out on the map lying over against and opposite to the premises conveyed, but with this clause: "Subject, nevertheless, to the use thereof by the public as heretofore granted and dedicated by said Morris."

There is no other evidence, as I understand, of a grant; at least none has been referred to in the proceedings, and it seems to be conceded by counsel that no grant was ever made by Morris. If there was such a grant, there is nothing here to determine the extent or nature thereof, and it would be difficult to determine just what it was, as it is conceded that the streets have never been laid out in accordance with any grant. In 1857 it is shown that Benjamin Whitlock made an application to discontinue Pontiac (Beck) and Uncas (Fox) streets from the line of the old stone wall, the boundary of the McConville tract eastwardly; and that on August 26, 1857, the freeholders of the town made and signed a certificate stating that said streets and avenues were useless and unnecessary, and the same ought to be discontinued; and that on August 26, 1857, an order was signed by the commissioners of highways, by which it was ordered and determined that the said portions of the streets should be discontinued. Chapter 277 of the Laws of 1864 authorized the trustees of the town of Morrisania to thereafter acquire title to all streets and highways in said town. It also authorized the trustees to assume all the duties and powers of the former commissioners of highways, and the commissioners were superseded by the trustees. Chapter 841 of the Laws of 1868 authorized the trustees of the town of Morrisania to lay out the town into streets, avenues, and roads, and directed that, whenever title to these avenues or roads thus laid out was to be acquired, that it was to be acquired in fee. In 1871 the trustees laid out East Morrisania into streets, adopting the streets as laid out by Morris in 1851 and 1858, and filed a map in the same year. It is conceded in the brief of the corporation counsel that the filing of this map shows for the first time any act of acceptance by the town of Morrisania, or of any one acting for the public, of the dedication by Morris, and referred to in the various conveyances. On May 23, 1873, Ann Eliza Timpson conveyed to John McConville. McConville died in July, 1875. His will was probated, and the property has since been held by trustees and executors under the will of John McConville. The deed from Timpson to McConville, dated May 23, 1873, contains no reference to the rights of the public in the streets. As has been said before, the former deeds contained this clause:

"Together with all the right, title, and interest of the said parties of the first part, their heirs and assigns, of, in, and to one-half of so much of the land con-

44 N.Y.S.—69

tained in the streets and avenues laid out on said map lying over against and opposite the premises hereby conveyed, subject, nevertheless, to the use thereof by the public as heretofore granted and dedicated by said Morris." `

This clause, which is in all the deeds from Morris down to Timpson, is omitted in the deed from Timpson to McConville. It is conceded that the streets were never actually laid out as contemplated, but that the streets Pontiac (Beck) and Uncas (Fox), within the lines of the McConville property, were always surrounded by a stone wall. The testimony of George C. Glacius is cited, who stated that he had known the property since 1851, and that since that time, up to a few years ago, the property was always inclosed by a stone wall, crossing Pontiac and Uncas streets, and was never used as a street.

The claim of the McConvilles is: First, that the title has become completed by adverse possession under the deed from Timpson in 1873; second, that the right of way, if any existed, was destroyed by nonusage for more than 20 years, and by public abandonment; third, that, under chapter 311 of the Laws of 1861, the rights of the public were determined by failure to use for six years; fourth, that the dedication by Morris never became effectual; fifth, that after the closing of the streets in August, 1857, there was never an intention of a rededication. Other points are raised, but they are practically involved in the general statement that the dedication has never become effectual.

Under the language of the conveyances introduced in this case, it becomes important, first, to consider what were the rights acquired by the public from the hands of Morris, and to define the principles which should govern the dedication as it appears to have been conducted in this case. Dedication, as applied to highways, involves not only the act of the owner of the property, but the act of the municipality. There can never be a dedication so as to constitute a highway without an acceptance by the authorities. Rights by prescription may attach with the consent of the owner, and the law may presume acquiescence or acceptance through acts of either party. But the rules governing this class of cases do not apply here. It is conceded that down to 1871 there had been no act on the part of the municipality which indicated any intention of accepting the streets in question. At the time Morris made the first conveyance to Whitlock, in 1855, he had already conveyed to Garner and Robinson certain lots on the opposite side of the street, bounding them by the streets in question. It may well be, at that time, that he considered, by reason of his action in plotting and conveying, that there were certain rights attached to the property conveyed; easements connected with the remaining property, which he should not convey. At all events, the clause inserted in his conveyance covers only such rights as he may have granted or dedicated. Now, what had he at that time parted with? So far as the evidence here shows, he had made a map indicating certain streets, and had sold certain lots to various individuals, bounding them by those streets. But,

when he comes to make the conveyance to Whitlock, he reserved such rights as he may theretofore have parted with, nothing more, viz. the right of the municipality to accept, within a reasonable time, the streets laid out by him, and the right of the individuals to whom he had sold lots to use the streets for that purpose so far as their conveyances gave them that right. As a prudent man, conveying property which might be subject to certain rights, he has undertaken to reserve them, whatever they may be; but this did not enlarge the rights of the municipality or of the private individual. He protected himself, however, against a breach of his covenant in the deed, by exempting whatever rights there might be in the land specified, viz. whatever rights there might be in the public by reason of his attempt to dedicate. If there had been a dedication, the public rights were conserved, and he was not liable upon a covenant of warranty. If there had not been such dedication, then his grantee took the land devested of any right of the public. Now, a dedication must, within a reasonable time, be followed by an acceptance; and the owner may, if not accepted within a reasonable time, recall the dedication; and he may at any time recall the dedication if no rights have attached intermediate his act. What is a reasonable time must depend upon the particular circumstances of the case. Lee v. Village of Sandy Hill, 40 N. Y. 442. The fact that Morris had in 1851 plotted certain grounds, by which he showed certain streets, ought not to bind Morris and every one thereafter to an irrevocable dedication of a highway, where no rights of the public or of individuals had intervened. If the public or the municipality desired to avail themselves of it, they should have indicated that desire. Now, when he comes to convey the property, he conveys subject to the rights of the public. It is seen that at that time the public had acquired no rights in the premises; neither had the municipality. There had been no acceptance, no laying out of streets,—nothing by which the municipality could be bound to maintain or use the streets; so that at that time Morris had a perfect right to withdraw the property; and I think he did that when he conveyed the property subject only to such rights as he had at that time parted with, if, as we have seen before, there was simply a sort of inchoate right on the part of the municipality,—the right to accept the property. There may have been some question in the minds of the parties at the time as to how far he might be bound by it, and, particularly, whether his sale of lots on the opposite side of the street from the property at that time conveyed to Whitlock might have conferred some rights either upon the public or other owners. And, as matter of caution, to protect himself against any claim under his warranty, he distinctly exempts any rights that may then exist. But his right, whatever it was, became subsequently merged in Whitlock by the purchase from Garner and Robinson, so that, by virtue of the deeds, Whitlock became the owner of all the rights of Morris in the street, except those dedicated at the time of the conveyance by Morris to Whitlock. It will be noticed that the clause in the subsequent deeds referred only to the dedication of Morris.

There is no claim of a dedication by any one subsequent to Morris, and I do not think that the clause inserted in the deeds down to 1873, reserving the rights of the public as dedicated by Morris, ought to be construed as. a rededication by the owners, but rather, simply, as a matter of caution in conveyancing.    Having received the premises subject to whatever rights Morris had given the public, they were conveyed subject to the same rights, though, as we have seen before, the language did not enlarge or restrict the rights of the public or of Morris in the premises.    They conveyed the premises as they received them.    They had done nothing in any manner indicating a desire. to extend the dedication that Morris had originally made.    In 1873, in the conveyance made to McConville, it was assumed that those rights, whatever they were, had been entirely extinguished, and I think correctly so.

There is another feature of this case which has been presented, which, under the view taken above, renders more than brief discussion unnecessary.    That is the effect of the order of discontinuance in 1857.    It is contended in the brief of the corporation counsel that such act was ineffectual, because, at the time such order was made or such proceedings were had, the highway was not, and had not been, in existence, and therefore it could not be discontinued as an old road.    People v. Griswold, 67 N. Y. 59.    And it seems to me that this is sound reasoning.    If there was no highway, certainly none could be discontinued. · But it seems that, while this may dispose of the question as to the effect of the order of discontinuance, it must also dispose of the question of acceptance.    Because if it be conceded that the attempt to dedicate was made in 1851, and that no action confirming or disaffirming was had until 1857, and then the authorities who.had control of it decided that it was useless, and ought to be discontinued, it would dispose of that question; for, whether those proceedings were regular or not, it was an indication on the part of the highway authorities that they· did not desire to accept the highway as a highway, but to relieve themselves of any responsibility which they may have had by reason of the dedication.    So that, if the proceedings were regular, if there was a highway at that time, it was discontinued by the proceedings.    If there was not, the proceedings have no force, except as evidence of an intention on the part of the authorities not to accept the highway; and this would seem to be conclusive.    If, as conceded, there was no acceptance up to this time, this positive declaration on the part of the commissioners would, it seems to me, absolutely destroy whatever rights the public had by reason of the attempted dedication by Morris in 1851.    It is not necessary to discuss the effect of filing the map of 1858, because at that time he had parted with the title to the property in question.

So far no reference has been had to the statute of 1861, which declared all highways abandoned which had not been laid out or used for six years.    It would seem that these premises were within the provisions of that act, if there was a public highway there at that time.    If it had been laid out and dedicated, and even form-

ally accepted, if it had not been worked and used as a road for six years, it would certainly have been discontinued under that provision of the statute.    At that time, and for a long time thereafter, that portion of what is now the city of New York was a part of Westchester county. not within the municipality of New York, and was subject to the highway laws of the state, and not to those governing streets in cities.    So that, if it was a highway at that time, it would have passed out of existence under the facts proven.    If it was not at that time a highway, then certainly the rights of the public as dedicated by Morris have been entirely lost, and the grantees under the deed from Morris acquired the title to the property devested of the easement of the public highway.

It may be that, in the light of the foregoing discussion, the question of adverse possession is of secondary consideration, but it may be well, perhaps, to briefly state its relation to this case.    There is not entire uniformity in the adjudicated cases upon the doctrine of adverse possession as applied to municipalities, many of the states adhering to the maxim, "Nullum tempus occurrit regi," while many of the other states (among them the state of New York) have restricted the application of the maxim to sovereignty alone; and most of them have held in cases requiring the decision that municipal corporations, like natural persons, are subject to the statutes of limitation.    Dill. Mun. Corp. § 674, and cases cited.    And this would seem to be the more reasonable rule under the system which has obtained in this state, the reasons for the rule not obtaining under a system which permits municipalities to hold for certain defined purposes, and which makes it incumbent upon public officials having charge of the property of the community to see to it that the rights of the public are not encroached upon or disturbed.    Hence, in cases of highways it is made the duty of the official of the public—the municipality—to remove the obstructions; and while, as said by the same authority, public officials may not defeat the rights of the public, yet there may grow up in consequence private rights of more persuasive force in the particular case than those of the public.    This principle, it would seem, is the one that should be applied to the case in hand, even if under the cases the statute of limitations does not apply.    It would certainly be inequitable that a municipality that for 20 years had taken no steps to accept a highway, and even had attempted to devest itself of whatever rights had been acquired, and to relieve itself from any responsibility whatever in regard to the highway, should, by simply filing a map, be said to have acquired rights against individuals who in the meantime have taken conveyances of the property, and have remained in possession during all that time.    And when is added to this the fact that for upward of 20 years after the filing of the map no further proceedings were taken to lay out a highway, or to take possession of the premises in question, it would seem that an estoppel had been completely established.    And here it may be said that the filing of the map of itself, under the statute, does not indicate that the trustees who filed it intended thereby to rely upon the dedications, for, under the stat-

ute, they were permitted to file a map showing streets through lands in which they had no right or title whatever; and hence it is not inconsistent to say that this map of 1871, which was filed, was filed by the trustees upon the understanding that they were to acquire the title to the streets indicated. It would certainly be more consistent to say that the trustees intended to acquire the title when the streets should be laid out than that they should rely upon a dedication made 20 years or more before, of which there had been no acceptance, but, so far as was in the power of the municipality, had been repudiated and rejected. As to the private rights, even if there had been no merger by the former conveyances, they were extinguished by the adverse possession of the McConvilles. Woodruff v. Paddock, 130 N. Y. 618, 29 N. E. 1021.

I have extended this discussion to a much greater length than I had anticipated, and much more might have been said upon the question raised, but it has seemed to be necessary to state my views at this length in order that there might be a clear understanding of them, and as they differ in some respects materially from those urged in either of the briefs submitted. And these views lead to the conclusion that the commissioners adopted an erroneous basis in arriving at an assessment; that the owners are entitled to have the value of the real estate, free from the right of way of the public or of the private owners, awarded to them; and the report must be returned for amendment and correction. Ordered accordingly.